# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **Appellee,** | : | |
| | : | |
| v. | : | **Mag. No.: 05-MJ-006 (TFH/JMF)** |
| | : | |
| | : | **Oral Argument: September 15, 2006** |
| **MAX OBUSZEWSKI,** | : | |
| **PERRY REEVE,** | : | |
| **LYNN ROBINSON,** | : | |
| **DON MULLER,** | : | |
| **EVAN LONG** | : | |
| | : | |
| **Appellants.** | : | |
| _____ | : | |

## OMNIBUS OPPOSITION BRIEF FOR APPELLEE

The United States of America, by and through the undersigned attorneys and hereby

submits its omnibus brief in opposition to appellant briefs  filed by Max Obuszewski, Perry

Reeve, Lynn Robinson, Don Muller and Evan Long, on or about July 17, 2006.  In support

thereof, the United States respectfully states as follows:

## I.   BACKGROUND

**A.     Procedural Background**

This is an appeal from a judgment of conviction for violating 36 C.F.R. § 7.96

(Demonstrating Without a Permit) entered by United States Magistrate Judge John Facciola

following a bench trial conducted on December 21, 2005.   The appellants, along with numerous

other individuals who are not part of this appeal, were found guilty of violating 36 C.F.R.

§ 7.96(g)(2) at the conclusion of the trial on December 21, 2005.

**B.   Factual Record**

   **1.   The Permit**

The evidence presented at trial established the following: on September 26, 2005, the appellants participated in a demonstration of over 370 people that culminated on the White House sidewalk, a park area administered by the National Park Service, located on the south sidewalk in the 1600 block of Pennsylvania Avenue, NW, Washington, DC, between East and West Executive Avenues, N.W.   The White House sidewalk is Park Service property and, by regulation, a demonstration on the sidewalk by more than 25 persons requires the issuance of a permit by the Park Service.  See 36 C.F.R. § 7.96(g); December 21, 1995 Transcript (hereinafter "Tr.") at 57-60.  The prescribed maximum penalty for the violation of Demonstrating Without a Permit is six months incarceration and/or a fine of $500.  See 36 C.F.R. § 1.3(a); 16 U.S.C. §§ 3 & 462(k).

On July 20, 2005, a group called the Iraqi Pledge of Resistance (IPR) applied for a permit to conduct a 1500 person anti-Iraq war demonstration on September 26, 2005, on the Ellipse and in Lafayette Park.  Gov't Exh. 1 at 10; Tr. at 51-53.  Notably, the initial application filed on July 20, 2005, did not seek a permit to protest on the White House sidewalk.  Gov't Exh. 1 at 10.  However, on July 28, 2005, the IPR submitted an addendum to the application seeking to include the White House sidewalk within those areas to be covered by the permit.  Id. at 13; Tr. at 66.  On September 23, 2005, following a series of emails between an IPR representative and Park Service representatives, IPR again modified its permit request, and explicitly requested only a permit to demonstrate on the Ellipse and Lafayette Park, and not on the White House sidewalk.  Gov't Exh. 1 at 16-21; Tr. at 67-69.   It is this final request that resulted in the issuance of the

2

permit at issue that did <u>not</u> include the White House sidewalk as a permitted area for the demonstration. <u>Id</u>.

In this correspondence, the IPR representative indicated that it was IPR's desire to engage in an act of civil disobedience on the White House sidewalk, and sought clarification of the arrest procedures that the Park Police would use in response. <u>Id</u>. at 16-18. John Harasek of the United States Park Police Intelligence/Counter-Terrorism Unit, responded to IPR's email, stating:

> I will to clarify an issue in reference to the Civil Disobedience that you plan to conduct on 9/26.
>
> I understand that once your group arrives at Lafayette Park and the Clergy delegation goes to the Northwest Gate of the White House, that they will walk to the center portion of the White House to commit civil disobedience, and that once they are arrested there will be waves or groups of others who come forward to be arrested.
>
> This process will not work. Once the group goes to the White House sidewalk and commits a violation, the Park Police will revoke the permit, close the area and give three warnings to those that remain. If they don't leave, they will be arrested as we previously spoke about.
>
> If you have more tha[n] the original group of Clergy that are seeking to be arrested they will have to come across onto the White House sidewalk in one group, because we will not allow others onto the sidewalk, once we close it.

<u>Id</u>. at 16-17. Mr. Harasek's email continued to describe the method that the Park Police would use in any police action, and stated:

> The other arrangements that we discussed still stand.
>
> Please ensure that people who intend on being arrested. . . . give any valuables, watches, jewelry, food, knives, backpacks etc. to one of their friends who are not being arrested to hold. This will allow the process to go much faster.
>
> That we intend probably to arrest females first, then males, then juveniles.

3

> I will be on the scene in front of the White House and if you seek me out, I will arrange it
> so that you and any other major organizes are not arrested until last so that you can
> facilitate the process and reassure the other protesters, if you so wish.

Id. at 17.

Following the above exchange of emails, the IPR representative sent a final email to the

Park Service on September 23rd, stating:

> I want to communicate that we do NOT wish our permit to include the White House
> sidewalk.  We would like to include the Elipse [sic] and Lafayette Park, of course, as we
> discussed previously, but to repeat we do not want the permit to include the White House
> sidewalk.   This decision will not change regardless of the answers to my previous
> questions, so please feel free to finish processing the permit so you can fax it to me this
> afternoon.

Id. at 19 (emphasis in original).

On September 23, 2005, the Park Service complied with IPR's request and issued Public

Gathering Permit No. 05-1625 for a demonstration on the east side of Lafayette Park and the

southeast quadrant of the Ellipse.   Id. at 4; Tr. at 52-53.   Consistent with the final request of the

demonstration's organizers, the permit did not provide for a demonstration on the White House

sidewalk.  Gov'ts Exh. 1 at 4; Tr. at 67-69.[1]

Accordingly, at no time were the protestors denied a permit to demonstrate on the White

House sidewalk by the Park Service.[2]  Rather, the permit was structured in this way – i.e., to

---

[1] Indeed, the Park Police issued no permit to any individual or organization to conduct a
demonstration of greater than 25 persons on the White House sidewalk on September 26, 2005.
Tr. 55-57.

[2] There is no prohibition in the NPS's regulations concerning demonstrations on the
White House sidewalk, and the Park Service frequently grants such requests to demonstrate.  Tr.
at 69-71.  Of course in this case, the appellants made no such request because, they desired to
create an "arrest zone" on the White House sidewalk where participants in the demonstration
could chose to congregate and risk arrest as an additional act of protest.

exclude the White House from the list of permitted locations for the demonstration -- at the request of the demonstration's organizers.   The reason for this requested omission is also obvious from the permit.   The permit's statement of purpose section indicates that following a lawful demonstration in Lafayette Park on September 26th, the demonstrators were planning an act of "[c]ivil [d]isobedience . . .on the White House sidewalk with approximately 300 individuals participating."  Gov'ts Exh. 1 at 4; Tr. at 52, 53-54.   As members of the Park Police discovered, that planned act of civil disobedience involved approximately 300 of the demonstrators crossing Pennsylvania Avenue from Lafayette Park, where the demonstration had been permitted, to the White House sidewalk, to demonstrate without a permit and be subject to arrest.  Tr. at 75.

    **2.**     **The September 26th Demonstration and Arrests**

In anticipation of that act of civil disobedience, officers with the United States Park Police ("Park Police") were alerted and assigned to the area surrounding the White House sidewalk, the Ellipse and Lafayette Park on September 26, 2005.  Tr. at 54-55, 74-76, 106-07. As the day progressed, a large group of peaceful demonstrators occupied Lafayette Park. Sometime prior to 1:30 p.m., a protest organizer walked through the group of demonstrators in the park and announced over a bullhorn:  "People that are willing to risk arrest please join us on the White House sidewalk now."   Gov'ts Exh 4; Tr. at 94.  Thereafter, at approximately 1:30 p.m. – in what appeared to Lt. Smith to be "an orchestrated event" – a group of over 300 demonstrators –  including the appellants -- crossed Pennsylvania Avenue, congregated on the center-portion of the White House sidewalk, and engaged in activities protesting the war in Iraq. Tr. at 80-81, 115-118, 134; Gov'ts Exh. 4.  These activities included carrying anti-war signs,

noisy yelling and chanting of political slogans, singing in unison, and sitting or laying on the sidewalk.   Tr. at 81, 134; Gov't Exh. 4.  For the most part, these protest activities were stationary and were "crunched" into the center portion of the White House sidewalk directly in front of the White House.   Tr. at 81-82, 134; Gov't Exh. 4.  The activities of the demonstrators were designed to, and did in fact, attract a crowd of on-lookers (and media) in Lafayette Park who were observing, and encouraging, the sidewalk protest.  Tr. at 81, 84, 97; Gov't Exh. 4.

Observing the demonstration on the White House sidewalk, and knowing it was done without permit, the Park Police officer-in-charge, Lieutenant Patrick Smith, determined that the group of demonstrators was in violation of NPS regulations that prohibit demonstrating without a permit.  Tr. at 74-75, 80, 84.  In response, Lt. Smith ordered that Park Police mass-arrest procedures be initiated.  Tr. 74-79, 84.  As Lt. Smith testified, the purpose of these mass-arrest procedures was:

> to make sure that no people that are not there to violate the law, [were] accidentally . . . mixed in with the violators.   So one of the things we'll do is if we have an area we want to isolate that area so members of the general public know that there's some type of police action taking place in there, and we don't want people to come in.   So we'll cordon off the area where we have the problem. . . . We also want to make sure that it's very clear to the people that are in that area where the violation's taking place that they are indeed violating the law.  And one of the procedures that we have in place is giving several warnings, at least three warnings, and we have a time period in between them so we make sure that we have the warnings in advance, and we actually have them so that we th4em off so there's no question from – if I were to be the one giving the warnings or somebody else, that there's consistency with the process.

Tr. 76-77.

Consistent with those mass-arrest procedures, the Park Police cordoned off the area in which the demonstrators were located on the sidewalk to prevent unwitting members of the public, unrelated to the demonstration, from wandering onto the sidewalk while the police action

was taking place.  Tr. 76-77, 84-85, 94, 96, 113; Gov'ts Exh. 4.  The Park Police left open a means of egress from the sidewalk, however, to allow demonstrators or onlookers who wished to leave the sidewalk – and avoid arrest -- to do so.  Once the perimeter had been formed, Lt. Smith asked the demonstrators for quiet over a bullhorn,[3] and then, over a period of 10 minutes starting at approximately 1:30 p.m., issued no less than four amplified warnings instructing the sidewalk demonstrators that they were in violation of Park Service regulations and must disperse from the sidewalk or be arrested.  Tr. at 77, 79, 85-87, 97-99, 101, 134; Gov's Exhs. 3-4.  Lt. Smith gave one of the warnings over a bullhorn, and three warnings over the amplified speakers on two police cruisers.  Tr. at 99, 103; Gov'ts Exh. 4.[4]  The latter three warnings over the amplified police cruiser speakers were given every three minutes; the first warning at 1:32 p.m., the second warning at 1:35 p.m., and the third warning at 1:38 p.m..  Tr. at 100; Gov'ts Exhs. 3-4.  As Lt. Smith testified, the purpose of the intervals between warnings was to allow demonstrators to leave the sidewalk, and thereby avoid arrest, if they so desired.  Tr. at 87.

Further, Lt. Smith also coordinated with some of the demonstration's organizers to have them "get the word out to their people . . . to make sure everybody knows that anybody that's on this White House sidewalk in this closed portion is going to be subject to arrest."  Tr. at 95.  Further, the demonstration's coordinators also assisted the Park Police by walking through the crowd of demonstrators and holding up their fingers to help the crowd keep count of the police

---

[3] Lt. Smith testified that he not only instructed the crowd to be quiet over his bullhorn, but also instructed the demonstration's organizers to spread the word "to be quiet"for the broadcast of the warnings.  Tr. at 98-99.

[4] One Park Police officer who was present at the demonstration testified that the warnings were audible at least 52 feet away from Lt. Smith.  Tr. 135.

warnings (as they were counting down to arrest).  Tr. at 102.  As a result of the warnings, a number of demonstrators did in fact leave the White House sidewalk.  Tr. at 87.  They were permitted to do so by the Park Police.  Tr. at 87.

 After Lt. Smith gave the  final warning to disperse, he waited a few additional minutes, and then ordered all those remaining on the sidewalk to be arrested.  Tr. at 87, 136-37.  Park Police officers then arrested all the individuals who chose to remain with the demonstration on the sidewalk.  Id.  Each of the defendants were charged with Demonstrating without a Permit in violation of 36 C.F.R. § 7.96(g)(2).

_____Every material fact of the demonstration is confirmed by a video of the protest which was admitted on DVD at trial as Government's Exhibit 4.  See Gov'ts Exh. 4.

_____**3.**    **The Trial**

On December 21, 2005, a bench trial was held in this matter before Magistrate Judge Facciola.  Twenty-five of the over 300 September 26th arrestees were tried.  All the defendants appeared pro se.  Magistrate Judge Facciola permitted an attorney, Mark Goldstone, to serve as an attorney-advisor for the pro se defendants.  Tr. at 5.  At the beginning of the trial, the United States agreed to waive its right to seek incarceration should the defendants be convicted.  Tr. at 16.  Further, the defendants and the government agreed that the defendants be tried jointly.  Tr. 16-25.  Pursuant to the agreed-upon process, the defendants selected representatives from among themselves to make an opening and closing statements that would be adopted by all the pro se defendants, to cross-examine the witnesses called by the United States, and to examine a pre-selected number of defense witnesses, chosen by the defendants, who would testify on behalf of all of the defendants.  Tr. 16-25.

During the trial, each of the defendants also stipulated as to their identity and the fact that they were among the group located on the White House sidewalk on September 26, 2005, which was warned to disperse by Lt. Smith, but refused to do so.  Tr. at 129-30; 138-40.  After the United States rested its case, the defendants called four witnesses, each of which were arrested for Demonstrating Without a Permit on September 26, 2005.[5]  This testimony was given on behalf of all the defendants.   Tr. at 16-25, 149, 184.

Each of the defense witnesses testified that they came to the White House on September 26, 2005, Tr. at 153, 155, 164, 172, 181, 188; that they voluntarily and intentionally crossed Pennsylvania Avenue to the White House sidewalk, Tr. at 157, 164, 166, 177-78, 188; to join a group that numbered well in excess of 25 persons, Tr. at 156, 166-67, 178, 181-82, 192-93; which was largely stationary on the center-portion of the sidewalk right in front of the White House, Tr. at 156, 178, 195; that, while on the sidewalk, they engaged in a peaceful attempt to petition the President, Tr. at 155, 170-71; conduct which included group chanting or singing in unison, Tr. at 156, 181, 193-94; or the placing of pictures or names of individuals killed in Iraq on the White House fence, Tr. at 153, 188; and that they did so with the knowledge that they risked arrest by their act of civil resistance without a permit on the sidewalk, Tr. at 157, 173, 175, 179, 181.

Indeed, none of the defense witnesses testified that they had procured a permit to demonstrate on the White House sidewalk, or that they were aware of anyone else who had done so.   Tr. at 158, 168, 179, 182.  Further, three of the four defense witnesses testified that they

---

[5] One of the four defense witnesses was Max Obuszewski, one of the appellants presently before this Court.   Tr. at 183.

heard the warnings from the police to leave the area.  Tr. at 153, 157, 165, 179.[6]  All of the

defense witnesses testified that, following the warnings, they refused to leave the sidewalk and

were subsequently arrested.   Tr. at 153, 158, 165, 167, 179, 189.   In closing, the defense argued

that their arrests were in "violation of our constitutional rights to peaceably assemble and

demand redress of grievances," and that the area in front of the White House should be "a free

speech zone where no permit is necessary."  Tr. at 206.

Following the trial, Magistrate Judge Facciola found each of the defendants guilty of

Demonstrating Without a Permit in violation of 36 C.F.R. § 7.96(g)(2).   The Court sentenced

each defendant to pay a $50 fine plus a $25 processing fee.

## 4.    The Appeals

Appellants – four of the defendants convicted by Magistrate Judge Facciola on December

21, 2006 – now appeal their convictions to this Court.   Each filed a separate brief.  Each brief,

however, joins in the brief of appellant Max Obuszewski.  Mr. Obuszewski's brief raises three

basic issues on appeal: (1) the NPS regulation governing the issuance of the permit at issue is

unconstitutional because it allegedly  imposes strict liability on demonstrators who lacked

knowledge of whether a permit has been issued; (2) the evidence was insufficient at trial to

establish that the appellants were demonstrating without a permit within the meaning of the

regulation; and (3) the trial court failed to set forth specific findings as to the appellants' guilt.[7]

---

[6]The fourth defense witness, appellant Obuszewski, testified that he "definitely believe[d] Officer Smith's testimony [concerning the giving of the warnings]. . . but . . . I can't honestly say whether I heard warnings or not.  It was a very, very emotional time.  Tr. at 194.

[7]  Mr. Obuszewski's brief makes the same arguments as those made on appeal on Cindy Sheehan's behalf in case number 05-mj-649 (AK).

Further, appellant Lynn Robinson's brief raises a more general First Amendment challenge to the permit regulation at issue, claiming that "the right to petition should supercede the need for a permit." Brief of Lynn Robinson at 2. The government does not believe the other pro se appellants' briefs raise substantive legal arguments that need to be addressed on appeal.[8]

As set forth more particularly below, each of appellants' arguments should be rejected. As an initial matter, appellant Robinson's First Amendment challenge should be rejected because the NPS permit regulation is content neutral and is otherwise a reasonable time, place and manner restriction on speech. With regard to the issue of the mens rea element of the permit regulation, it was not raised or in any way preserved below, and, therefore, the argument should be deemed waived. In any event, the permit regulation is not unconstitutional because, by its own terms it includes a mens rea element or, at the very least, does not unambiguously require strict liability, and thus a mens rea requirement appropriately inferred into the regulation by this

_____

[8] As Judge Facciola did below, this Court should reject appellant Reeve's assertion that her conviction should be overturned because she did not receive discovery prior to trial in this matter. See April 3, 2006 Order. Consistent with its obligations under Rule 16, the government provided discovery to whichever of the over 300 September 26th arrestees who requested it. Undersigned counsel has no record of Ms. Reeve requesting discovery until January 20, 2006 – after the trial had concluded. (Ms. Reeve states that she left a message "on a telephone machine" requesting discovery on December 16th.) Further, Ms. Reeve did not make known her desire for discovery, or the fact that she had not received it, to either the government or the Court prior to the start of the trial when the problem could have been easily addressed. Indeed, undersigned counsel had copies of discovery available at counsel's table prior to the trial for any demonstrator who asked for it. A number of defendants did walk up and ask for discovery, and it was provided to them. Ms. Reeve's desire for discovery could have been addressed just as easily had she made it known prior to the start of trial. She did not. A defendant sitting on her rights does not provide a compelling basis to overturn a conviction. Moreover, given the defendant's trial stipulation that she (along with the other defendants) was not contesting her identity nor the fact that she remained on the White House sidewalk on September 26, 2006, following the Park Police warnings to disperse, it is hard to see how the any of the discovery that she would have been provided (which included only her arrest paperwork, and no Brady material) would have been material to the defendant's case.

Court.  In any event, the appellants' convictions should be upheld because the record here amply

demonstrates that they <u>intentionally</u> demonstrated without a permit on the White House sidewalk.

Finally, inasmuch as appellants failed to request specific findings pursuant to Rule 23(c) below,

the trial court was not obliged to set forth any specific findings.  Therefore, their convictions

should be affirmed.

## II.  <u>ARGUMENT</u>

### A.    The National Park Service's Permit Regulation Is a Reasonable Time, Place And Manner Restriction

As they did below, appellants argue on appeal, albeit in a cursory fashion, that their

conduct in seeking to petition the government on September 26, 2005, on the White House

sidewalk did not require a permit as it was protected by the First Amendment.   According to

appellants, "the right to petition should supercede the need for a permit."  Brief of Lynn

Robinson at 2.

As Magistrate Judge Facciola held below, appellants are incorrect.   Tr. at 211-12.  While

the First Amendment reflects this nation's commitment to the principle that "debate on public

issues should be uninhibited, robust, and wide open," <u>New York Times v. Sullivan</u>, 376 U.S.

254, 270 (1964) (internal citations omitted); <u>accord</u> <u>Boos v. Barry</u>, 485 U.S. 312, 318, (1988), it

is well-established that the right to express ideas is not wholly unfettered.  Thus, "the First

Amendment does not guarantee the right to communicate one's views at all times and places or in

any manner that may be desired." <u>Heffron v. International Society for Krishna Consciousness,</u>

<u>Inc.</u>, 452 U.S. 640, 647 (1981).  Similarly, it is beyond dispute that "[n]othing in the Constitution

requires the Government freely to grant access to all who wish to exercise their right to free

speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." Cornelius v. NAACP Legal Defense and Educational Fund Inc., 473 U.S. 788, 800 (1985). As the Supreme Court put it : "We have regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." United States v. Grace, 461 U.S. 171, 177-178 (1983)(internal quotation marks omitted). Thus, the government may in appropriate circumstances place reasonable restrictions on the time, place or manner of protected speech, so long as ample alternative means of communication are left open. See also, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789 (1984) [Taxpayers for Vincent]; Heffron, 452 U.S. at 647-48; ISKCON v. Kennedy, 61 F.3d 949, 955 (D.C. Cir. 1995); Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984) ("[e]xpression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, and manner restrictions").

Although the White House sidewalk is among the category of public fora that are "vital to a healthy and robust public discourse," First Amendment activities on the sidewalk may also be limited by reasonable time, place, and manner restrictions. See White House Vigil for the ERA Comm. v. Clark, 746 F.2d 1518, 1526-27 (D.C. Cir. 1984); see United States v. Grace, 461 U.S. 171, 177 (1983). In such a case, government regulation must be narrowly tailored to serve a significant public interest and must leave open alternative means and methods of communication. Id.

The National Park Service's regulations at issue governing demonstrations on the White House sidewalk and in Lafayette Park have repeatedly withstood First Amendment challenge in

the Court of Appeals.  See Quaker Action Group v. Morton, 516 F.2d 717, 727 (D.C. Cir. 1975)

(NPS' permit system for use of National Park property near White House is constitutional);

White House Vigil, 746 F.2d at 1527 -1528; United States v. Musser, 873 F.2d 1513 (D.C. 1989)

(regulation prohibiting unattended signs did not violate First Amendment); United States v.

Cinca, 56 F.3d 1409, 1404, n.12 (D.C. Cir. 1995)(rejecting as applied First Amendment

challenge to NPS regulation).  While the residual question of the constitutional vitality of the

section 7.96(g)(2) permit requirement has never been expressly considered by the D.C. Circuit,

this Court in United States v. Barton "easily rejected" such a First Amendment challenge.  See

United States  v. Barton, 1988 WL 13174, *3 (D.D.C. February 11, 1988).   As this Court noted

in Barton, a permit requirement may be an acceptable time, place and manner restriction and

such requirements do not offend First Amendment principles as a matter of law.  See id. (citing

Hynes v. Mayor of Oradell, 425 U.S. 610, 617 (1976) (narrowly drawn ordinance that does not

vest too much discretion in permit-granting official may be valid)).  The critical question is

"whether the regulatory provisions requiring a permit vests a government official with

unconstitutionally broad discretion to grant or deny the permit."  Id. (citing Shuttlesworth v. City

of Birmingham, 394 U.S. 147, 150-51 (1969)).  Although appellants make no such allegation that

the permit regulation at issue here allows the NPS Regional Director too much discretion in

14

denying permits,[9] as this Court held in <u>Barton</u>, section 7.96(g)(4) narrowly defines the circumstances under which a permit may be rejected.[10] <u>Id.</u>

Further, while the D.C. Circuit has not address the NPS's permit requirement explicitly, the Court of Appeals' analysis of the constitutionality of NPS regulation's restricting the size and use of signs on the White House sidewalk in <u>White House Vigil</u> remains instructive on the First Amendment issue.   As the D.C. Circuit reasoned there:

> The regulations challenged here are clearly not based "upon either the content or subject matter of speech."  There is nothing in the text or the history of the regulations to suggest that one group's viewpoint is to be preferred at the expense of others. . ..

> The regulations also clearly satisfy the constitutional requirement that they leave open ample alternative channels of communication.  Demonstrators on the sidewalk are free to engage in a rich variety of expressive activities: they may picket, march, hand out leaflets, carry signs, sing, shout, chant, perform dramatic presentations, solicit signatures for petitions, and appeal to passersby.  The content of the message they espouse is theirs and theirs alone; they may express views and employ verbal formulae that would be punished as seditious libel, blasphemy or obscenity in less free societies. . . . Should they find the government's regulations too restrictive they may always carry their demonstration immediately across Pennsylvania Avenue to Lafayette Park. In short, the regulations leave unaffected a multitude of possibilities for meaningful protest on the sidewalk and within a few yards in adjoining areas.

---

[9]  Indeed, it would be hard for appellants to make such a claim as the NPS never denied them a permit to demonstrate on the White House sidewalk.  Rather, a permit for a demonstration on the White House sidewalk was purposely <u>not</u> sought by the demonstration's organizers so as to create an "arrest-zone" where demonstrators who felt so moved could congregate and risk a symbolic, peaceful mass arrest that would be a part of the protest itself.

[10] Section 7.96(g)(4)(iii) empowers the Regional Director of the National Park Service to deny an application if: (1) an application for an incompatible activity has been filed and has been or will be granted; (2) the proposed special event or demonstration "will present a clear and present danger to the public safety, good order, or health"; (3) the proposed activity is of such a nature or duration that it cannot reasonably be accommodated in the national park area designated in the application; or (4) the application proposes activities contrary to law or the regulations.

The regulations also clearly serve a "substantial governmental interest."  No one can deny the substantiality or the significance of America's interest in presidential security.  At stake is not merely the safety of one man, but also the ability of the executive branch to function in an orderly fashion and the capacity of the United States to respond to threats and crises affecting the entire free world. Nor is the interest in pedestrian safety and  traffic insubstantial; the value of sidewalks as public fora would be considerably vitiated were the state unable to provide for the orderly passage of those persons who use them. Finally, the government has a substantial interest in the preservation and enhancement of the human environment; aesthetics are a proper focus of governmental regulation.

White House Vigil, 746 F.2d at 1527 -1528 (citations omitted).   For the same reasons here, the permit requirement for a demonstration on the White House sidewalk is not unconstitutional on its face.

Appellants' attempt to articulate an "as applied" First Amendment challenge fails as well. Appellants cite nothing in the record to support their bald assertion that "the demands for permits are not uniformly applied [by NPS], and some forms of speech are approved, and others are not."  See Brief of Lynn Robinson at 2.   Nor is there any support in the case law.  See CCNV, 468 U.S. 295 n.6 (affirming finding of lower court that Park Service consistently applied and enforced regulations in a fair and non-discriminatory manner); White House Vigil, 746 U.S. at 1527 (rejecting allegation that NPS applied White House sidewalk regulations in a discriminatory fashion); Juluke v. Hodel, 811 F.2d 1553, 1561-62 (D.C. Cir. 1987) (rejecting allegation that United States Park Police engaged in selective enforcement of White House

sidewalk regulations).[11]   The First Amendment claims that the appellants actually raised below

fail.

**B.    Appellants Belated Assertion That NPS' Permit Regulation Is Unconstitutional Because It Purportedly Imposes Strict Liability Fails**

      **1.    Appellant's Strict Liability Challenge Should Be Deemed Waived As They Failed To Raise It Below**

On appeal to this Court, appellants seek for the first time to challenge the NPS permit

regulation as unconstitutional because it allegedly lacks a <u>mens rea</u> element.   At no point below

did they raise such a claim, or anything like it.  Indeed, unlike in <u>United States v. Cindy Sheehan</u>,

Cr. No. 05-MJ-649 (TFH/AK), the United States did not object at trial to the introduction of

evidence demonstrating the appellants' mental state in this matter.   Indeed, the question of the

appellants' knowledge concerning the lack of a permit to demonstrate on the White House

sidewalk on September 26,2005, was repeatedly addressed throughout the trial.  Tr. at 158, 168,

179, 182; <u>see also</u> Tr. at 204-05 (Government in closing arguing that the demonstrators

"intentionally" did not seek a permit so as to "provide an area for . . . those who felt the need to

cross Pennsylvania Avenue and engage in a demonstration without a permit on the White House

sidewalk at risk of arrest."; defendants "made a conscious decision to engage in the time-honored

act of civil disobedience. . . .").   Appellants should not now be heard to mount a facial challenge

---

[11]  Similarly baseless is appellants' assertion that the prosecution of these cases was selective because "some people have [had] the charge dropped, or no paperwork filed for their arrests."  <u>See</u> Brief of Lynn Robinson at 2.   Again, appellants provide no citation to the record supporting this assertion.  <u>See id</u>.  In fact, where the government could make its case at trial against a demonstrator, that demonstrator was brought to trial.   Where it lacked the evidence necessary to prove a demonstrator's guilty on the day of trial (because the arresting officer was unavailable, or the government's evidence was otherwise infirm), it did not seek to prosecute the individual.   That is proper, not malicious, prosecution.

to a regulation the basis for which they did not raise, and was not at issue, below.  The argument is properly deemed waived.

Indeed, Rule 12(b) of the Federal Rules of Criminal Procedure requires that certain issues, including constitutional challenges, be raised prior to trial.  United States v. Drew, 200 F.3d 871, 876 (D.C. Cir. 2000)(Second and Fifth Amendment challenge waived if not made prior to trial); United States v. Badru, 97 F.3d 1471, 1475 (D.C. Cir. 1996)(facial constitutional challenge to criminal statute cannot be made for the first time on appeal); United States v. David, 96 F.3d 1477 (D.C. Cir. 1996)(commerce clause challenge waived because it was not made prior to trial), cert. denied, 519 U.S. 1136 (1997).[12]  The fact that the challenge is based on constitutional concerns matters not.  A constitutional challenge is waivable like any other.  See Perez v. United States, 501 U.S. 923, 936-37 (1991) ("The most basic rights of criminal defendants are similarly subject to waiver."; collecting cases); see generally Yakus v. United States, 321 U.S. 414, 444(1944) ("No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right.").   Because there is nothing in the record demonstrating that the appellants preserved their mens rea constitutional argument, it should be deemed waived.[13]

---

[12]  See also United States v. Weathers, 186 F.3d 948 (D.C. Cir. 1999)(double jeopardy challenge waived); United States v. Sobin, 56 F.3d 1423, 1427 (D.C. Cir. 1995)(waiving alleged violation of Miranda rights); United States v. Mangieri, 694 F.2d 1270 (D.C. 1982)(matters waived if not raised in motions to suppress).

[13] Nor should appellants be heard to argue that their belated strict liability argument was preserved by their assertion of a "time, place, and manner" First Amendment challenge below.  Challenging a criminal offense on the basis that it allegedly lacks mens rea is not a "time, place and manner" argument – indeed, it is not a First Amendment argument at all.  See, e.g., Staples v. United States, 511 U.S. 600, 604-20 (1994)(analyzing whether 26 U.S.C. § 5861(d) required that
(continued...)

18

Indeed, the appellant did not file a motion in writing or make one orally at trial challenging the alleged lack of a <u>mens rea</u> element in the NPS' permit regulation. Therefore, the Court should reject this argument and affirm their convictions.[14]

2. **<u>Appellant's Strict Liability Constitutional Challenge Should Be Denied</u>**

Appellants contend that their convictions should be reversed because the NPS permit regulation purportedly lacks a <u>mens rea</u> element and, thus, is unconstitutional. Obuszewski Br. at 3-4. Even if the appellants had preserved this argument for appeal, the argument lacks force because the regulation does include a <u>mens rea</u> element or, at the very least, one can and should be implied under long-standing case law. In any event, as demonstrated in section C.ii. below, the record here demonstrates that the appellants knew, or at the very least should have known, that their conduct was in violation of NPS' regulations on September 26, 2005.

As an initial matter, it should be noted that courts are divided about whether a scienter element is constitutionally required for every element of a permit regulatory scheme, even when a violation of the scheme impacts the First Amendment. <u>Compare</u> <u>United States v. Johnson</u>, 988 F. Supp. 920, 922-24 (W.D.N.C. 1997) (scienter not required for every element of Forest Service's permit regulation; regulation does not violate First Amendment), <u>aff'd</u>, 159 F.3d 892,

---

[13](...continued)
a defendant know whether the characteristics of his weapon made it a "firearm" under the statute); <u>United States v. Balint</u>, 258 U.S. 250, 254 (1922) (analyzing whether the Narcotic Act of 1914 required proof only that the defendant knew that he was selling drugs, not that he knew the specific items he sold were "narcotics" within the ambit of the statute).

[14] Although the federal rules provide for relief from a waiver by the trial court where good cause is shown, <u>see</u> Fed. R. Crim. Pro. 12(e), the appellants fail to make any such showing here. Certainly, there is no basis to permit them to raise this argument after the trial has concluded. In light of the fact that appellants' argument focuses on the language of the regulation, there is no reason why this was not raised prior to trial, or, at the very least, during the trial.

895 (4th Cir. 1998)(declining to address mens rea issue) with American-Arab Anti-

Discrimination Committee v. City of Dearborn, 418 F.3d 600 (6th Cir. 2005) (scienter needed) .

Nevertheless, fairly read, the NPS regulation at issue here does include a mens rea element and,

thus, is not a true strict liability offense.   The regulation defines "demonstrations" as including:

> demonstrations, picketing, speechmaking, marching, holding vigils or
> religious services and all other like forms of conduct which involve
> the communication or expression of views or grievances, engaged in
> by one or more persons, the conduct of which has the effect, intent, or
> propensity to draw a crowd or onlookers.

36 C.F.R. § 7.96(g)(1)(I).  Importantly, the definition then distinguishes such plainly expressive

conduct from "casual park use," stating:

> The term does not include casual park use by visitors or tourists which does not
> have an intent or propensity to attract a crowd or onlookers.

Id.  Thus, the regulatory definition encompasses conduct which a reasonable person would know,

or should know, amounts to a "demonstration."   That is, conduct – like picketing, speechmaking,

marching, holding vigils, or religious services – that involves the "communication or expression

of views or grievances" and which does in fact draw a crowd of onlookers, or is intended, or

could reasonably be expected, to draw a crowd.  Thus, the entire definition – when read as a

whole which appellants fail to do – is positively replete with mens rea.  The definition makes

clear that it does not encompass the unwitting, non-demonstrative conduct of the casual park

visitor.  That is, conduct that is either unexpressive in nature or which does not draw a crowd and

is neither intended, nor reasonably could be expected, to do so.

   Thus, appellant wrongly argues that the permit regulation lacks "any" mens rea

requirement.  See Obuszewski Brief at 4.  Rather than read regulation's language as a whole,

which this Court must do, appellants seek to parse the definition of "demonstrations" and argue that its reference to conduct that has the "effect" or "propensity" to draw a crowd of onlookers necessarily implies a strict liability offense.  See id.  It does no such thing.  Rather, the regulation distinguishes between expressive conduct that either intentionally draws a crowd, or could reasonably be expected to, and the unwitting, non-demonstrative conduct of the casual park visitor.  Indeed, appellants' analysis wrongly assumes there is only two possible mental states: actual knowledge as to an element of the offense or no knowledge at all.  As this Court is well-aware, that is not the case.  There are, in fact, a range of mens reas falling between the two.[15]

Thus, contrary to appellants' assertion, the regulatory definition of "demonstrations" includes mens rea.  And that mens rea with respect to the definition of "demonstration" is necessarily carried into the permit regulation itself which includes the term "demonstration."  See 26 C.F.R. § 7.96 (g)(2)(stating that "Demonstrations . . . may be held only pursuant to a permit issued in accordance with the provisions of this section. . .") (emphasis added).  Moreover, appellants further mis-interpret the language of the permit regulation when they suggest that it necessarily implies strict liability because the provision could be violated merely if one small group of demonstrators demonstrates along side another small group of demonstrators, such that together they number more than 25 demonstrators.  See Obuszewski Brief at 4.  That is not what the regulation provides.  Rather, it states that demonstrations of twenty-five or fewer may be held without a permit provided  "that the group is not merely an extension of another group already availing itself of the 25-person maximum under this provision or will not unreasonably

---

[15]    Nor is it correct to suggest, as appellants do, that the only constitutionally-permissible scienter, even in the First Amendment context, is actual knowledge of the element of a criminal offense.  See Smith v. State of California, 361 U.S. 147, 154-55 (1960).

21

interfere with other demonstrations or special events." 36 C.F.R. § 7.96(g)(2)(I)(emphasis

added).  Plainly, the regulation addresses the scenario where two groups of less than 25 <u>are in

fact related to each other</u>, or have consciously joined together, not, as suggested by the

appellants, where two small, unrelated groups happen to be demonstrating in the same area.  <u>See

United States v. Barton</u>, 1988 WL 13174 *2 (D.D.C. Feb. 11, 1988) ("If defendants were not

card-carrying members of APT, they certainly became an extension of that group by <u>knowingly

joining</u> the APT group as it crossed Pennsylvania Avenue and <u>participating in the protest

activities of the group</u>.")(emphasis added).  A permit is required in the former situation, but not

in the latter.  Thus, appellants concern that  "the regulation will ensnare those who act with no

criminal intent" ignores the language of the regulation, and is entirely overblown.  Obuszewski

Brief at 4.

    For all these reasons, it cannot be said that the regulation in question was purposefully

drafted to exclude a scienter requirement.   Accordingly, even if appellants were correct in their

assertion that the regulation is silent concerning the <u>mens</u> <u>rea</u> with respect to the "lack of a

permit" element of a §7.96(g) violation, such a conclusion would <u>not</u> lead to a determination that

the regulation be discarded by this Court as unconstitutional.  Indeed, to do so would violate the

well-established presumption that some form of scienter is to be implied in a criminal regulation

or statute, even if it is not explicitly expressed in the provision's language, so as to avoid

substantial constitutional questions.  <u>See</u> <u>United States v. X-Citement Video, Inc.</u>, 513 U.S. 64,

69-70 (1994); <u>Staples v. United States</u>, 511 U.S. 600, 605 (1994).  As the Supreme Court has

instructed, in this area, courts should not "simply follow the most grammatical reading of the

statute" but interpret "criminal statutes to include broadly applicable scienter requirements, even

22

where the statute by its terms does not contain them."  X-Citement Video, Inc., 513 U.S. at 70.

This is because "silence . . . by itself does not necessarily suggest that Congress intended to

dispense with a conventional mens rea element, which would require that the defendant know the

facts that make his conduct illegal." Staples, 511 U.S. at 605; see also United States v. United

States Gypsum Co., 438 U.S. 422, 438 (1978) ("[F]ar more than the simple omission of the

appropriate phrase from the statutory definition is necessary to justify dispensing with an intent

requirement.").  Rather than discard such a statute or regulation as unconstitutional, as appellants

demand here, the Supreme Court instructs courts to follow this "background common law rule of

scienter" and inferred mens rea, for crimes  "even where the statutory definition did not in terms

include it." United States v. Balint, 258 U.S. 250, 253 (1922); see also Staples, 511 U.S. at 619;

Gypsum Co., 438 U.S. at 468.  Indeed, it is incumbent upon courts to read a statute or regulation

to include mens rea, thereby eliminating "serious constitutional doubts," so long as such a

reading is "not plainly contrary to the intent" of its drafters.  X-Citement Video, 513 U.S. at 79.

Appellants have demonstrated no reason why the Court should not follow that well-established

23

presumption of scienter here.[16]  Accordingly, their belated constitutional challenge, if not waived,

is properly denied on the merits.

## C.    The Record Evidence Was More Than Sufficient To Find Appellants Guilty of Intentionally Demonstrating Without a Permit

The record here amply demonstrates the appellants' guilt under even the most demanding

mens rea – i.e., that they intentionally demonstrated without a permit.   Appellants' arguments to

the contrary are little more than an invitation to this Court to second guess the trier of fact in this

case.  While the appellants contend that the evidence should have been viewed differently, their

arguments wholly fail to demonstrate that there was no evidence upon which a reasonable trier of

fact could have based its finding of guilty.   Accordingly, as demonstrated below, the appellants'

convictions should be upheld on the merits.

### 1.    Standard of Review

As this Court is aware, in reviewing appellants' insufficiency arguments, the reviewing

court does not consider the evidence anew.  United States v. Wynn, 61 F.3d 921 (D.C. Cir.

1995).  Rather, it must consider "'whether, after viewing the evidence in the light most favorable

to the prosecution, any rationale trier of fact could have found the essential elements of the crime

_____

[16] For this same reason, the appellants' reliance on American-Arab Anti-Discrimination Committee v. City of Dearborn, 418 F.3d 600 (6th Cir. 2005) and Smith v. California, 361 U.S. 147 (1960), is misplaced.   In both cases, there was never any dispute that the statute at issue imposed strict liability.   Rather, unlike here, the government argued in both cases that the law at issue imposed strict liability but fit within the narrow "public welfare" exception to the general requirement that criminal liability not be imposed absent some level of mens rea.  See City of Dearborn, 418 F.3d at 610-611; Smith, 361 U.S. at 152-53.  When the government's argument was reject in both cases, the courts were confronted with a statute that neither party disputed imposed strict liability, and the constitutional issue could not be avoided.  Thus, neither case addressed, rather less applied, the well-established presumption that scienter should be implied in a criminal regulation or statute, even if it is not explicitly expressed in the provision's language, so as to avoid substantial constitutional questions.  See id. at 610-12.

beyond a reasonable doubt.'" United States v. Cinca, 56 F.3d 1409, 1413 (D.C. 1995)(applying 36 C.F.R. § 7.96 and quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  As the court noted in Cinca, this standard affords great deference to the trier of fact's role, drawing all reasonable inferences from the evidence in favor of the government, and allowing the trier of fact to assess the weight and credibility of the evidence and testimony.  Id.  On appeal, conflicts in the testimony are to be resolved in favor the government.  United States v. Thomas, 864 F.2d, supra, at 192.  Moreover, the government's case may be entirely circumstantial and need not exclude every possible theory of innocence.  United States v. Bryant, 117 F.3d 1464 (D.C. Cir. 1997)(applying the same standard in reviewing non-jury trials), cert. denied, 118 S. Ct. 1510 (1998); United States v. McFarlane, 445 F.3d 29, 31 (4th Cir. 2006).  It is only when no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt that an appellate court will reverse on sufficiency grounds.  United States v. Levi, 45 F.3d 453, 457 (D.C. Cir. 1995).  Applying these principles to appellants' arguments concerning the evidence, it is clear that their convictions must be affirmed.

### 2.    **The Record Evidence**

Appellants first argue that the evidence was not sufficient for a rational trier of fact to find that their was "demonstrating" within the meaning of the National Park Service's regulation.  See Obuszewski's Br. at 4-9.  Appellants are wrong.  Their attempt to re-weigh the record evidence fails.  There is ample basis in the record for a reasonable trier of fact to conclude that appellants were demonstrating within the meaning of the regulation.

As the government demonstrated in its case-in-chief, following the amplified announcement on Lafayette Park of one of protest organizer's calling all "[p]eople [who were]

willing to risk arrest [to] join us on the White House sidewalk now," it was undisputed that over 300 people, in what appeared to be "an orchestrated event," crossed Pennsylvania Avenue and joined a group of over 300 demonstrators congregated on the center-portion of the White House sidewalk protesting the Iraq war.  Tr. at 80-82, 94, 115-118, 134; Gov'ts Exh. 4.  These activities included carrying anti-war signs, noisy yelling and chanting of political slogans, singing in unison, and sitting or laying on the sidewalk.  Tr. at 81, 134; Gov'ts Exh. 4.  The protest activities did in fact, attract a large crowd of on-lookers (and media) in Lafayette Park who were observing, and encouraging, the sidewalk protest.  Tr. at 81, 84, 97; Gov'ts Exh. 4.  During the trial, the appellants stipulated to their identity and the fact that they were among the group located on the White House sidewalk on September 26, 2005, which was given no less than four amplified warnings to disperse or be arrested, but who refused to leave the demonstration despite a reasonable opportunity to do so.  Tr. at 77, 79, 85-87, 97-99, 101, 103, 129-30, 134, 138-40; Govt's Exhs. 3-4.

Each of these facts is confirmed not only by the testimony of the police witnesses below, but also by a video which was made of the demonstration, see Gov'ts Exh. 4, as well as each of the defense witnesses below who testified that on September 26th they voluntarily and intentionally crossed Pennsylvania Avenue to the White House sidewalk, Tr. at 157, 164, 166, 177-78, 188; to join a group that numbered well in excess of 25 persons, Tr. at 156, 166-67, 178, 181-82, 192-93; to engage in a peaceful attempt to petition the President, Tr. at 155, 170-71; which included group chanting or singing in unison, Tr. at 156, 181, 193-94; or placing pictures or names of individuals killed in Iraq on the White House fence, Tr. at 153, 188; and that they did so with the knowledge that they risked arrest by their act of civil resistance without a permit

on the sidewalk, Tr. at 157, 173, 175, 179, 181.    Further, three of the four defense witnesses

testified that they heard the warnings from the police to leave the area.  Tr. at 153, 157, 165,

179.[17]  All of the defense witnesses testified that, following the warnings, they refused to leave

the sidewalk and were subsequently arrested.   Tr. at 153, 158, 165, 167, 179, 189.

 None of the defense witnesses testified that they had procured a permit to demonstrate on

the White House sidewalk, or that they were aware of anyone else who had done so.   Tr. at 158,

168, 179, 182.  In fact the record evidence was clear that there was no permit on September 26th

for a group in excess of 25 people to demonstrate on the White House sidewalk. Gov't Exh. 1 at

4; Tr. 52-53, 55-57, 67-69.

 Moreover, none of these facts are contested on appeal.   In their joint brief, appellants

again concede that on the day of their arrest "hundreds of people had gathered near the White

House to express their opposition to the war in Iraq and that many of them were singing,

chanting, praying, or otherwise petitioning the government."  Obuzewski Br. at 5.  Further,

appellants do not dispute that they were "at the White House while this activity was underway."

Id.  Similarly, appellant Robinson concedes in her appellate brief, that her "actions were

protected by the first amendment since we were peacefully gathering around the White House

sidewalk and attempting to petition our government."   Robinson Br. at 4.  Likewise, appellant

Reeve concedes:

> On September 26th, I thought I would advise President Bush of a way out of Iraq, and
> made a sign from the late senator George D. Aiken's statement:   "Declare Victory, Come
> Home Now." . . . I was arrested on the side walk in front of the apparent "Picture Zone."

---

[17]The fourth defense witness, appellant Obuszewski, testified that he "definitely
believe[d] Officer Smith's testimony [concerning the giving of the warnings]. . . but . . . I can't
honestly say whether I heard warnings or not.  It was a very, very emotional time.   Tr. at 194.

I also had a sign of an Iraqi 2 year old who was killed in Iraq as well as an Officer Gordon from Texas.   I thought it was my first Amendment right to petition and advise my President."

Reeve Br. at 4-5.  Similarly, appellant Muller, calling himself a "protestor," states that "[i]t has become abundantly clear – even more so – since our arrests on September 26, 2005, . . . that we defendants were right to protest."  Muller Br. at 1.

Nevertheless, appellants contend that their repeated concessions concerning their participation in the September 26th demonstration do not "relieve the Government of its burden of proving that [the appellants themselves], by [their] own words or acts engaged in criminal behavior."  Obuzewski Br. at 5-6.  According to the appellants there must be more "individualized" proof of their guilty.  Appellants' argument misconceives the import of the record evidence demonstrating the scope and nature of the September 26th protest and the undisputed testimony below that each of the defendants joined that group demonstration, and refuse to separate themselves from it .   Putting to one side the direct evidence in the record of the appellants' "own words or actions" during the protest which were demonstrative in nature,[18] the fact that each of the appellants joined what was unquestionably a demonstration of more than 25 people, and then did not separate themselves from it when given ample opportunity to do so following the Park Police's four warnings, is, at the very least, very persuasive circumstantial evidence that the appellants were knowing, active participants in the demonstration itself.   Such evidence would alone be enough to uphold appellants' convictions.   See United States v. Bryant,

---

[18]  Appellant Obuszewski's testified at trial that he joined other demonstrators on the White House sidewalk on September 26th to "petition the government," placed the names of individuals who had died in Iraq on the White House fence as a "[s]ymbolic form of petitioning the government," and then remained on the White House sidewalk joining others who were crying, singing or chanting.  Tr. 185, 188, 192-93.

117 F.3d 1464 (D.C. Cir. 1997) (government's case may be entirely circumstantial and need not exclude every possible theory of innocence).

Moreover, such evidence is consistent with this Circuit's large-scale demonstration case law which appreciates that proof in such mass arrest cases necessarily focuses on the actions of the protesting group "as a unit." This case law stands for the proposition that where an individual defendant has joined an unlawful group demonstration, and fails to separate from it after being given sufficient notice and opportunity to do so, he or she can fairly be held accountable for the regulatory violations of the group. Three cases spell out this principle.

First, in <u>Washington Mobilization Committee v. Cullinane</u>, 566 F.2d 107 (D.C. Cir.1977), the D.C. Circuit faced the question whether the police were justified in arresting demonstrators innocent of any violence or obstruction along with others who were violating the law, or whether the only constitutionally valid procedure would be to arrest the lawbreakers individually. The Court of Appeals ruled that the police may not be expected or required to single out individuals once a demonstration became "substantially infected with violence or obstruction." Rather, it was "the tenor of the demonstration as a whole that determines whether the police may intervene; and if it is substantially infected with violence or obstruction the police may act to control it as a unit." <u>Id</u>. at 120. The First Amendment does not conflict with the need for flexibility when dealing with large, unlawfully congregated assemblies: "Confronted with a mob the police cannot be expected to single out individuals; they may deal with the crowd as a unit." <u>Id</u>. However, the <u>Cullinane</u> decision included an important <u>caveat</u>:

> We do not suggest of course that one who has violated no law may be arrested for the offenses of those who have been violent or obstructive. As we have seen however the police may validly order violent or obstructive demonstrators to disperse or clear the

streets.  If any demonstrator or bystander refuses to obey such an order after fair notice
and opportunity to comply, his arrest does not violate the Constitution even though he has
not previously been violent or obstructive.

Id.

With regard to any subsequent prosecution, the Court of Appeals in Cuillane went on to

instruct that, even in the absence of a contemporaneous completion of field arrest forms

demonstrating the individualized facts of the arrest of each protestor, a prosecution could,

nevertheless, proceed, because:

the prosecutor may well be able to prove, by the testimony of policemen who were at the
scene, that there was probable cause to believe that the group as a whole was violating the
law by violence or obstruction, or by remaining on the scene after reasonable notice and
opportunity to disperse.

Id. at 121.

Shortly after its decision in Cullinane, the Court of Appeals applied this principle in

Dellums v. Powell, 566 F.2d 167 (D.C. Cir. 1977), a mass-arrest case involving a largely

peaceful protest on the Capital steps.  Again, the issue arose that not all the arrestees were

obstructive or even noisy.  Rather, the testimony was that only a small minority of the

demonstrators were "involved in any mischief."  Id. at 181.  Thus, it was undisputed that not all

of the arrestees were violating the Capital Grounds statute which prohibited such mischief.

Nevertheless, the D.C. Circuit, following Cuillane, held that the arrests of all the demonstrators

"as a group" would be permissible if it could be shown (1) that the demonstrators could be

validly evicted under the Capitol Grounds ordinance, (2) that the police gave demonstrators an

order to disperse that "apprised the crowd as a whole that it was under an obligation to leave,"

and (3) that there had been a "reasonable opportunity" to comply.  Dellums, 566 F.2d at 183.

Dellums emphasized that "the 'fair notice' required by the Cullinane court is notice reasonably

30

likely to have reached all of the crowd despite any noise the demonstrators may have been making." Id. at 181-82 n. 31.

More recently, in United States v. Cinca, 56 F.3d 1409 (D.C. Cir. 1995), the defendant was convicted, along with many others, of demonstrating on the White House sidewalk after a permit to do so had been revoked for a sign violation. The defendant complained, much like appellants here, that there was no individualized evidence that he had violated the Park Service's regulation as "he was not holding a sign." Id. at 1414, n.12. Nevertheless, the Court of Appeals upheld the defendant's conviction, and ruled that the defendant was fairly charged with the group's violation of the regulations because there was "no real dispute that appellant . . . joined the . . . demonstration on the White House on that day." This finding was based on the undisputed fact that the defendant remained sitting with the group of demonstrators after the Park Service's had given multiple to disperse. According to the Court of Appeals, those warnings gave the appellant "adequate notice that the Park Service officials considered him to be part of the group of students demonstrating under the revoked permit in violation of § 7.96 (g)(2)(I)." Id. at 1414, n.11. When the defendant failed to leave the demonstration after being given ample opportunity to do so, according to the D.C. Circuit, he was fairly treated by both the Park Service and the trial court as having "joined the group." Id. at 1414.[19] And "as a participant in the group's demonstration," the defendant was then "subject to the regulations as applied to the group." Id. at 1414, n.12.

---

[19] In so holding, the D.C. Circuit distinguished the facts in Cinca from "a case in which an individual is charged with the group's violations of regulations without having joined the group's demonstration." Id.

31

This principle makes sense in the mass-demonstration context. Indeed, a violation of §7.96(g)(2) is necessarily a "group offense" because the regulation requires the participation of 25 or more people: the regulation makes unlawful non-permitted demonstrations, not demonstrators. Stated another way, as this Court has noted, the "unlawful act" prohibited by §7.96(g)(2) is "participating with a group of more than twenty-five people in a demonstration for which a valid permit [does not] exist[]." See Barton, 1988 WL 13174, *2 (D.D.C. Feb. 11, 1988). Under Cuillane, Dellums, and Cinca, an individual who refuses to disperse from such a demonstration after fair warning and opportunity to do so, can fairly be adjudged a willing "participant in the demonstration," and rightfully held accountable for the group's violation of §7.96(g)(2), even absent any other "individualized" proof of that individual's demonstrative conduct during the demonstration. Indeed, to impose a requirement that the government present "individualized proof" of the demonstrative conduct engaged in by each participant in a large-scale group protest would be patently unreasonable as it would render proof in most mass arrest cases impossible and NPS's permit regulations a nullity.[20]

For the same reason, appellant's reliance on Barham v. Ramsey, 434 F.3d 565 (D.C. Cir. 2006) is misplaced. Obuzewski Br. at 7. In Barham, unlike in this case, the police did not give any warnings to the demonstrators who were arrested, or give them any opportunity to disperse, before conducting the mass arrest at issue there. The Court of Appeals ruled that such an approach was plainly unconstitutional. Id. at 576. Consistent with Dellums and Cullinane, the appellate court held that the police "could not 'deal with the crowd as a unit' unless [it] first

---

[20] As Lt. Smith testified in this case, the Park Police arrested over 370 participants in the demonstration on September 26, 2005 – the most arrests the Park Police had ever made at one time and location. Tr. at 79, 124.

issued an order to disperse and then provided a reasonable period of time to comply with that order."  Id.  It is the absence of those critical warnings and opportunity to disperse which distinguishes the facts in Barham from this case.[21]

In this case, the record reflects that the Park Service provided the appellants with the "fair notice" required by Cullinane, Dellums, and Cinca (and absent in Barham) by warning them no less than four times, using an amplified sound system, that they were demonstrating in violation of Park Service regulations, and must either disperse or be arrested.[22]  The appellants were given 10 minutes to comply.  It is undisputed that, although some of the demonstration's participants did so, none of the appellants did.  Each of them remained on the White House sidewalk, standing in solidarity with their fellow demonstrators who, together, continued protesting by carrying signs, singing, and chanting against the Iraq war.  Thus, the police, and a reasonable trier of fact, could conclude, based on that evidence alone, that the appellants had intentionally "joined the group" of demonstrators, and hold the defendants accountable for the regulatory violations of the group, i.e., intentionally participating in a demonstration without a permit in violation of §7.96 (g)(2).

---

[21] Similarly inapposite are Kotteakos v. United States, 328 U.S. 750 (1946), Zafiro v. United States, 506 U.S. 534, 541 (1993) and United States v. Haldeman, 559 F.2d 31 (D.C. Cir. 1976), on which appellants rely for the assertion that proof in a criminal case must be "individualized" and "based on evidence of that defendant's own conduct."   None of these cases involve large-scale demonstrations and the rules developed by the D.C. Circuit specifically to address issues of constitutionality and proof in mass arrest cases.

[22] Further, Lt. Smith also coordinated with some of the demonstrations organizers to have them "get the word out to their people . . . to make sure everybody knows that anybody that's on this White House sidewalk in this closed portion is going to be subject to arrest."   Tr. at 95.

Those four Park Police warnings also address the appellants' repeated assertion that there was allegedly no record evidence demonstrating their knowledge that there was no permit to conduct a demonstration on the White House sidewalk on September 26th.   Again, appellants are incorrect.  As an initial matter, there was direct evidence in the record of appellants' knowledge that there was no permit to demonstrate on the White House sidewalk.  Further, none of the defense witnesses below testified that they had procured a permit to demonstrate on the White House sidewalk, or that they were aware of anyone else who had done so.   Tr. at 158, 168, 179, 182.   Indeed, appellant Obuszewski admitted on cross-examination that he was aware that the permit was only for a demonstration on the Ellipse and in Lafayette Park on September 26th.   Tr. at 192.  In any event, the Park Police's repeated, amplified warnings – which none of the defense witnesses below denied occurred – were sufficient to put the demonstration's participants on notice that there was no permit for the demonstration,[23] and that they needed to disperse immediately or be arrested.  See Cinca, 56 F.3d at 1414, n. 11 ("[T]he Park Service's warnings defeat any argument that [appellant] did not have adequate notice that the Park Service officials considered him to be part of the group of students demonstrating under the revoked permit in violation of § 7.96(g)(2)(I)."); see also United States v. Thomas, 864 F.2d 188, 198 (D.C. Cir.

---

[23] The appellants' suggestion that their convictions should be reversed because an earlier version of the permit at issue, which at the request of the protestors would have allowed a demonstration on the White House sidewalk, was not explicitly revoked in writing pursuant to 36 C.F.R. § 7.96(g)(6) when the final permit was issued excluding the White House sidewalk as a permitted location for the sidewalk, is, as Magistrate Judge Kay found in United States v. Cindy Sheehan, frivolous.  Obuszewski Br. at 8-9.   The record plainly shows that the permit at issue was amended – and thus never revoked – at the explicit request of the demonstration's organizers to exclude the White House sidewalk so as to create an "arrest-zone" where demonstrators who could congregate and risk a symbolic, peaceful mass arrest that would be a part of the protest itself.  Gov'ts Exh. 1 at 4, 16-19; Tr. at 52, 53-54, 65-69.  Accordingly, as no permit in this case was ever revoked by the NPS, section 7.96(g)(6) has no application here.

34

1988) (three verbal warnings from police put defendant on notice of camping restriction under 36

C.F.R. § 7.96).   Appellants' undisputed failure to heed those warnings, and decision to remain

with the unlawful demonstration, along with the other record evidence of the scope and nature of

the September 26th demonstration, was an ample basis upon which a rational trier of fact could

have found all the appellants guilty of intentionally Demonstrating Without a Permit.

**D.    Appellants Demand For Particularized Factual Findings Comes Too Late Under
       F.R.Cr.Proc. 23 (c)**

Appellants' final contention is that the trial court erred by failing to make "particularized

findings" regarding their guilt.   The Court should reject this argument because appellants failed

to exercise their right to ask for specific findings regarding their guilt or innocence below.   It is

too late to make such a request now.

Rule 23(c) of the Federal Rules of Criminal Procedure governs this issue in non-jury

trials.  It provides:

> [i]n a case tried without a jury, the court must find the defendant guilty
> or not guilty.  If a party requests before the finding of guilty or not
> guilty, the court must state its specific findings of fact in open court
> or in a written decision or opinion.

F.R.Cr.Proc. 23(c); see also United States v. Alameh, 341 F.3d 167 (2d Cir 2003); United States

v. Andreen, 628 F.2d 1236 (9th Cir. 1980).  Appellants made no such request below.

Accordingly, no specific factual findings were required by the trial court.  See United States v.

Musser, 873 F.2d 1513, 1519 (D.C. Cir. 1989)(specific findings were waived in non-jury trial

involving First Amendment challenge to 36 C.F.R. § 7.96).  Accordingly, appellants' belated

demand for particularized findings on appeal to this Court should be rejected.

35

## CONCLUSION

For the foregoing reasons, the government respectfully requests this Court uphold the

appellants' convictions for Demonstrating Without a Permit.

Respectfully submitted,

Kenneth L. Wainstein
UNITED STATES ATTORNEY

_____

G. Michael Harvey
ASSISTANT UNITED STATES ATTORNEY
Bar No.447-465
Federal Major Crimes Section
555 4th Street, N.W., Room 4243
Washington, D.C.  20530
202/305-2195

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Omnibus Opposition Brief for
Appellee was served by U.S. mail on August 31, 2006, upon the pro se defendants as follows:

Max Obuszewski
3338 Gilman Terrace
Baltimore, Maryland 21211

Alviso, Patricia Alvarez
17040 Bluewater
Huntington Beach, CA 92649-2932

Athey, Jeannie Lucille
2305 Gold Mine Road
Brookeville, MD 20833-2233

Berg, Michael S.
1406 Pennsylvania Avenue
Wilmington, DE 19806-4119

Bostrom, John

205 Ward Avenue
Staten Island, NY 10304-2140

Chadwick, Timothy D.
3936 Pricetown Road
Fleetwood, PA 19522-9030

DeRaymond, Joseph
349 Main Street
Freemansburg, PA 18017-6809

Daniels, Robert Lee
138 High Street
Jim Thrope, PA 18229-1912

Hollinger, Robert C.
409 Kerwin Rd
Silver Spring,  MD 20901-1751

Johnson, Michael Thomas
1923 E. Lombard Street #2
Baltimore, Maryland 21231-1909

Lynn Robinson
406 Westgate Road
Baltimore, MD 21229

Leclaire-Connay, Courtney
3232 So. County Trial
West Kingston, RI 02892


Lawton, Michael S
2814 Shakespeare Road
Bethlehem, PA 18017-3216

Don Muller
P.O. Box 1042
Sitka, Alaska 99835

Perry Reeve
P.O. Box 23154
Ketchikan, Alaska 99901

Long, Evan
63 Jakes Pl.
Colchester, VT 05446-9504

Simon, Andrew L
P.O. Box 52
Westford, VT 34340-5263

Mark Goldstone, Esq.
Standby Attorney-Advisor for *Pro Se* Defendants
9419 Spruce Tree Circle
Bethesda, MD 20814

_____
ASSISTANT UNITED STATES ATTORNEY